UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DOUG GOLD, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | No. 3:09-0211 |
| v. | ) | Judge Echols |
| | ) | |
| WILSON COUNTY SCHOOL BOARD | ) | |
| OF EDUCATION, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiffs filed a Motion for Preliminary Injunction (Docket Entry No. 4), to which Defendants filed a response in opposition (Docket Entry No. 34), and Plaintiffs filed a reply (Docket Entry No. 44). The Court held an evidentiary hearing on Monday, April 20, 2009.

The Plaintiffs are five couples who sue for themselves and on behalf of their minor children who attend Lakeview Elementary School ("Lakeview") in the Wilson County School System. The Plaintiffs are: Doug and Christy Gold and their children H.G. and J.G. ("the Golds"); James and Jennifer Walker and their child, A.W. ("the Walkers"); Lee and Jana Miller and their children L.M. and N.M. ("the Millers"); Edward and Stacey Joyce and their child, T.J. ("the Joyces"); and Jon and Melynda Bounds and their child, R.B. ("the Bounds").[1] Named Defendants are: the Wilson County Board of Education ("the Board"); the Director of Schools for Wilson County, James M. Davis ("Director Davis"); Lakeview Principal Stan Moss ("Principal Moss"); and Lakeview Assistant Principal Bertie Alligood ("Assistant Principal Alligood").

---

[1] Some of the adult Plaintiffs are parents of older children, but the older children are not Lakeview students and hence, they are not named Plaintiffs in the case.

1

This case follows a prior case concerning religious activity at Lakeview that was decided by the Court last year. Doe v. Wilson County School Sys., 564 F.Supp.2d 766 (M.D. Tenn. 2008). Doug and Christy Gold and James and Jennifer Walker, who are among the Plaintiffs in this case, were Intervenor-Defendants in the Doe case.

In Doe the Court held that Lakeview administrators and some teachers became excessively entangled with certain religious activities of the Praying Parents group at Lakeview during the 2005-2006 school year, which resulted in school endorsement of the Christian beliefs of the Praying Parents in violation of the First Amendment Establishment Clause. Id. at 790-803. The Court also held that certain other activities at Lakeview, such as including a nativity scene at the end of the kindergarten Christmas program and teaching the kindergarten class a Thanksgiving prayer indicative of the historical origin of the holiday, were not in violation of the Constitution. Ultimately, the Court granted the Does limited injunctive relief. After explaining the Court's legal analysis, near the end of the Doe opinion the Court expressly observed:

> There is no justiciable controversy before the Court concerning alleged violation of the constitutional rights of the Intervenor-Defendants. They produced no evidence of a constitutional injury inflicted upon them by the Lakeview school administration which the Court is called upon to address at this time. There is no evidence that Lakeview administrators currently favor non-religious groups over the Praying Parents group, or that Lakeview administrators preclude the Intervenor-Defendants from participating in any activity on the same basis as other individuals or groups.

Id. at 803.

This subsequent case now raises a controversy about First Amendment free speech rights of the named Plaintiff students and parents that was not presented in Doe. Plaintiffs filed this lawsuit under 42 U.S.C. § 1983 challenging Wilson County Board of Education Policy Number 1.806 (amended 6/04/2007). Plaintiffs allege the policy–both facially and as applied–unconstitutionally

restricts the Plaintiffs' religious speech on posters the Plaintiffs wish to display in the Lakeview main lobby and hallway leading to the cafeteria to describe and announce religious events such as See You At The Pole™ ("SYATP") and the National Day of Prayer ("NDP"). These events are non-curricular activities that are organized and conducted by private individuals and held before school hours on Lakeview property with permission of the school administration. Plaintiffs allege the policy gives school administrators unbridled discretion to approve some speech while rejecting other speech, and that school administrators unconstitutionally apply the policy to silence religious speech while allowing non-religious speech, thus demonstrating blatant viewpoint discrimination and hostility toward religion.

In the Verified Complaint, Plaintiffs claim that Defendants violated their First Amendment free speech rights and their Fourteenth Amendment due process and equal protection rights. In addition to the facts stated in their Verified Complaint, Plaintiffs filed ten (10) affidavits in support of their request for preliminary injunctive relief. (Docket Entry Nos. 1, 5-14.) Plaintiffs did not present any additional evidence at the evidentiary hearing except through cross-examination of Defendants' witnesses. Plaintiffs primarily rely on the previously-filed affidavits to support their motion for a preliminary injunction.

Defendants filed separate Answers to the Verified Complaint admitting in part and denying in part the facts stated in the Verified Complaint. Defendants deny that they violated Plaintiffs' constitutional rights. Defendants did not file any affidavits to support their response to the motion for a preliminary injunction, but they did present the testimony of three witnesses at the evidentiary hearing, Director Davis, Principal Moss, and Assistant Principal Alligood.

Plaintiffs objected to the Court taking live testimony at the hearing because Defendants did not supply affidavits in support of their response when they had the opportunity to do so. The Court determined, however, that Defendants' Answers placed many important facts in dispute, and where facts are disputed on a motion for a preliminary injunction, an evidentiary hearing is ordinarily required. See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 553 (6th Cir. 2007); Bonnell v. Lorenzo, 241 F.3d 800, 809 (6th Cir. 2001). Therefore, the Court proceeded with an evidentiary hearing. The Court emphasizes that its ruling on the motion for a preliminary injunction is based on the limited evidentiary record before it, and this ruling will not be binding at the trial on the merits after a full evidentiary record is presented following discovery. Six Clinics Holding Corp., II v. Cafcomp Sys., Inc., 119 F.3d 393, 400 (6th Cir. 1997).

## I. **FACTS**

The Golds, Walkers, Millers, Joyces and Bounds are Christians who firmly believe in prayer, trusting in God, and living their faith in all aspects of life. They do not believe in abandoning their Christian faith and beliefs when they step on Lakeview's public school grounds.

Since 2002 Jennifer Walker has participated in an informal group at Lakeview known as the "Praying Parents." She served as the leader of the Praying Parents for six of the past seven years. For the past several years, some of the parents involved in Praying Parents helped interested Lakeview students organize and promote the SYATP and NDP events held at Lakeview each school year before school hours with the permission of the school administrator.

SYATP is a national event that is sponsored by the National Network for Youth Ministries. SYATP occurs annually on the third or fourth Wednesday of September. On that day, students across the country ranging in age from pre-school to college gather around the flagpoles at their

4

respective schools to pray for their schools, teachers, communities and families. Mrs. Walker has assisted Lakeview students in organizing the SYATP event for their school since 2003.

NDP is a long-standing, sanctioned national event held each year on the first Thursday in May for all citizens to pray for the nation and government leaders.[2] In the past, Mrs. Walker led the effort to help Lakeview students organize NDP to coordinate with the national event, but in the last three years Mrs. Gold assumed the organizational role for NDP.

Mrs. Walker, Mrs. Gold and other Lakeview parents involved in organizing SYATP and NDP use flyers and posters to announce the upcoming events. Initially, Mrs. Walker made the flyers and posters herself. Later, for the NDP event, she used notices supplied by the national NDP organization. Starting in the 2005-2006 school year, event organizers invited Lakeview students and their families to participate in a contest to make posters to promote the SYATP and NDP events. No school funds or supplies are used to make flyers or posters for these two events, and posters are made at home during non-school hours.

In the school years between Fall 2005 and Spring 2008, parents of Lakeview students who participated in the SYATP and NDP events displayed the promotional posters made for the events in Lakeview's main lobby and in the hallway leading to the cafeteria. The posters were displayed for several days prior to the events. According to Plaintiffs, in prior school years the school administration freely allowed SYATP and NDP posters to include religious words and phrases

---

[2]The Court notes that NDP is established by federal statute. Title 36 U.S.C. § 119 provides:

> The President shall issue each year a proclamation designating the first Thursday in May as a National Day of Prayer on which the people of the United States may turn to God in prayer and meditation at churches, in groups and as individuals."

5

indicative of the events, including "pray," "prayer," "come pray with us," "God," "God bless America," and "In God We Trust." Other groups, like Girl Scouts, Cub Scouts, and Big Brothers/Big Sisters, also traditionally display posters describing and promoting their themes and events in the same school lobby and hallway.

On May 29, 2008, the Court issued its decision in the <u>Doe</u> case. In that opinion, the Court discussed the posters that were created to promote the SYATP and NDP events during the 2005-2006 school year. <u>Doe</u>, 564 F.Supp.2d at 781-782, 785-787, 789-790, 801-802. The Court noted that the posters "contained patriotic and religious symbols and content." <u>Id.</u> at 786. Some of the posters depicted words like "God" or "Jesus" or a pair of praying hands, a symbol associated with praying and Christianity. <u>Id.</u> The Court also observed that James Doe, a Lakeview kindergarten student, was required to walk through the school lobby and hallway to the cafeteria and he recognized the religious symbolism of the posters. <u>Id.</u> His parents, the Does, objected to the display of overtly Christian posters in the school.

The Court observed that none of the Praying Parents' promotional advertisements for their events stated "whether student participation in the event was voluntary, required, or subject to parental consent or whether Lakeview endorsed or sponsored the event." <u>Id.</u> at 781. As one way to avoid any further unconstitutional endorsement of the Praying Parents' activities, including the SYATP or NDP events, by Lakeview administrators and teachers as had occurred in the past resulting in an Establishment Clause violation, the Court directed that in the future "any flyers, signs, posters, notices or announcements promoting such events must include a disclaimer that the Wilson County School System and the administration of the Lakeview School do not endorse or

sponsor the events[.]"[3] Doe, Civil No. 3:06-0924, Docket Entry No. 134, Order at (3)(g) (M.D. Tenn. May 29, 2008) (unpublished).   The Court also noted in the Doe opinion that,

> [s]ince the 2006-2007 school year, the Director of Schools must approve all flyers to be distributed to students, including those of the Praying Parents group.  All such flyers are now made available in the Lakeview School office for students to pick up if they want them.  Students may make flyers for the "See You At the Pole"™ and "National Day of Prayer" events and distribute them at school to other students.

Id. at 778.

The 2008 SYATP event was scheduled to occur on Wednesday, September 24, 2008. Organizers for the event eliminated the poster contest of the past.  Mrs. Walker sent an email to interested families to inform them of the need for home-made posters to announce and promote the SYATP event.  She included in the email the theme scripture verse for 2008, which she obtained from the national SYATP Internet website.  The theme was "'Speak, for your servant is listening.' 1 Samuel 3:9."  Mrs. Walker advised the families that they could use cut outs or other phrases they thought could be used to describe and draw attention to the event.  Mrs. Walker anticipated receiving all of the posters by Friday, September 19, but she was willing to accept posters until the following Monday, September 22.

Mrs. Walker also submitted a flyer designed to promote the SYATP event to school administrators for approval.  (Def. Ex. 5.)  The flyer depicted a waving American flag, under which

---

[3]Contrary to the current Plaintiffs' assumption that the Court's Order in Doe explicitly approved all religious speech that might appear in SYATP or NDP flyers distributed or posters displayed at Lakeview, the Court's opinion in Doe did not address or resolve Plaintiffs' free speech rights under the First Amendment.  The Court held only that the entanglement of Lakeview administrators and teachers with the activities of the Praying Parents resulted in a violation of the Establishment Clause.

Case 3:09-cv-00211   Document 45   Filed 05/01/09   Page 7 of 39 PageID #: 345

appeared the name, date, time and location of the SYATP event. Below that information appeared the following paragraph:

> On Wednesday, September 24, students and families across the United States will be meeting around school flagpoles to pray for their schools, each other, and our country. Come be a part of this national event by meeting at Lakeview's flagpole at 6:40 a.m.
>
> We'll "See You At The Pole!"

(Def. Ex. 5.) On the lower left side of the flyer appeared the words: "*Rain or Shine. SYATP is sponsored by Praying Parents." The flyer was emailed to Director Davis on Monday, September 15, and he approved the flyer for distribution at Lakeview. (Def. Ex. 8.)

Principal Moss explained that, once the flyer was approved by Director Davis for distribution, Mrs. Walker made copies of the flyer and left the copies at the Lakeview office. Announcements were then made over the school public address system notifying students about various flyers, including the flyer for the SYATP event, that were available in the office. Interested students could then stop by the office to pick up flyers they wished to take home with them.

All of the Plaintiff children, assisted by their families, created and submitted posters to Mrs. Walker for the 2008 SYATP event by September 19, except for the Millers and their child, L.M., who planned to make a poster over the weekend and submit it to Mrs. Walker on Monday, September 22. Mrs. Gold and Mrs. Miller agreed to meet Mrs. Walker at Lakeview on September 19 to display the collected posters in the main lobby and the hallway to the cafeteria which were used for this purpose.

In an effort to comply with the Court's decision in Doe, Mrs. Gold prepared a typed disclaimer to be placed on each poster. The disclaimer read: "See You At The Pole is a student

8

initiated and student led event and is not endorsed by Lakeview Elementary or Wilson County Schools." (Def. Ex. 3.)

Early Friday morning, September 19, Mrs. Walker arrived at Lakeview to meet Mrs. Gold and Mrs. Miller. They planned to place disclaimers on approximately nine SYATP posters and display them in the customary hallways. When Mrs. Walker carried the posters into the school office, a Lakeview secretary saw them and informed Mrs. Walker that she would not be allowed to display the SYATP posters at the school. According to Mrs. Walker, the secretary said: "You can't hang up those posters. They have the word 'God' on them. Mr. Moss said they can't be hung up like that." (Docket Entry No. 6, Jennifer Walker Aff. ¶ 22.) Defendants admit that the secretary made these statements, but they contend the secretary did not have authority to speak for them.

Mrs. Walker was highly offended by the secretary's stern words. She believed a decision to bar the posters "flew in the face of" this Court's decision in Doe. (Id. ¶ 23.) Mrs. Walker asked why SYATP posters with the word "God" on them could not be displayed. While they were talking, Principal Moss, who was out of state that day on personal leave, happened to call the school office to check on various school matters. The secretary told Principal Moss that Mrs. Walker was present and asking questions about the SYATP posters.

Until this phone call to the school office that morning, Principal Moss was unaware that any parents were going to bring posters to the school office for approval on that day. On September 15, 2008, Angie Elkins, a member of Praying Parents, had brought two posters for the SYATP event to the school office to use at the school. The posters were obviously drawn by elementary students and included American flags and the phrases "Come pray with us!" "Jesus wants you to come to the pole," "Jesus loves you!" "God Bless the USA" and "Come Pray with us at the pole." (Id.) Principal

9

Moss took photographs of the posters and told Mrs. Elkins that he was concerned about the religious language on the posters in light of the Doe lawsuit, and he would contact Director Davis and the Board's attorney for advice. Director Davis and the attorney advised Principal Moss that the content of the SYATP posters should be limited to the name of the event, date, time, and location. When Principal Moss passed this information on to Mrs. Elkins, she decided to take the posters home rather than display them in the school hallway. Principal Moss asked Mrs. Elkins to pass on to other members of the Praying Parents group that posters and flyers should include only the name of the event, date, time and location even though Director Davis had already approved language on the flyer advertising the event which included the word "pray." Principal Moss does not know if Mrs. Elkins passed his message to restrict the information on the posters to others, or if she did, to whom.

Principal Moss testified that other groups also seek to advertise their events at Lakeview, such as Boy Scouts and Girl Scouts. Their posters are pre-approved by Director Davis, and the content is limited to name, date, time and location of the event. The Scouts might post one announcement at the front door and one in the cafeteria. Principal Moss also testified that none of the Lakeview students had ever approached him about organizing the SYATP and NDP events. In his opinion, the activities are not student-led and student-initiated, but are organized by the Praying Parents.

With all of this in mind after the secretary had told Principal Moss about what she considered to be offensive or impermissible religious language on the posters, Principal Moss asked the secretary to transfer his call to Assistant Principal Alligood. He did not ask to speak directly to Mrs. Walker.

10

Assistant Principal Alligood was new at the school and had been assigned to Lakeview only since January 2008. She testified she knew vaguely about the Praying Parents group, had read the Court's <u>Doe</u> opinion, and knew that the lawsuit cost the school district a lot of money. At the time of Principal Moss's call, she had just finished supervising the arrival of students at school that morning and she was busy with various duties.

Upon taking the transferred phone call, Assistant Principal Alligood informed Principal Moss that the SYATP posters had Bible verses on them, but she did not mention the posters also included patriotic slogans like "In God We Trust," and "God Bless America." He instructed her to look at the posters carefully to be certain they complied with Board policy and this Court's Order in <u>Doe</u> and to contact Director Davis for his opinion.

Assistant Principal Alligood had just called Mrs. Walker into her office when Mrs. Gold arrived with the disclaimers to be put on the posters. Mrs. Walker quickly explained the school's objections to Mrs. Gold and together they walked into Assistant Principal Alligood's office.

The parties sharply dispute what happened next. The following is Mrs. Walker's testimony. According to Mrs. Walker, Assistant Principal Alligood told them that posters containing religious references, like "In God We Trust," "God Bless America," and "Come and Pray" were precluded under Board policy because the phrases were considered to be inappropriate for the school hallways. (Jennifer Walker Aff. ¶ 26.) Mrs. Gold pointed out that the posters would contain a disclaimer as ordered by this Court. However, this fact seemed inconsequential to Assistant Principal Alligood, who reported to them that she was following orders and any poster with religious jargon on it could not be displayed in the school hallways. (<u>Id.</u>) Mrs. Walker and Mrs. Gold tried to explain their understanding that the Court's Order in the <u>Doe</u> case did not censor the content of the posters, but

11

only required a disclaimer. They also stated that their posters advertising a religious event should be allowed in the school hallways just like posters for non-religious events were permitted in the school hallways and that Lakeview could not discriminate against religion. After much discussion, Assistant Principal Alligood agreed to contact Director Davis for further guidance.

Mrs. Walker and Mrs. Gold further attest that Assistant Principal Alligood then contacted Director Davis by telephone and related to him their comments and concerns, including their understanding that the SYATP posters could be displayed with the appropriate disclaimer under this Court's prior Order in Doe. Upon ending her telephone conversation with Director Davis, Assistant Principal Alligood reported to Mrs. Walker and Mrs. Gold that Director Davis was steadfast and he stated that under Board policy all religious references on posters were banned. (Jennifer Walker Aff. ¶ 28.) Assistant Principal Alligood then reiterated to Mrs. Walker and Mrs. Gold that the SYATP posters did not comply with Board policy and would not be permitted in the Lakeview hallways. According to Mrs. Walker, "[e]ven if communicated by students, any religious reference would be deemed inappropriate for display in the hallways." (Id. ¶ 29.)

Mrs. Walker then asked Assistant Principal Alligood what, if anything, could be done to use the student posters to advertise the SYATP event since there was not enough time before the SYATP event to make completely new posters without religious references. Assistant Principal Alligood told Mrs. Walker and Mrs. Gold that Director Davis would allow the SYATP posters to be displayed only if Mrs. Walker and Mrs. Gold covered up the religious phrases on the posters. Assistant Principal Alligood provided Mrs. Walker and Mrs. Gold with green paper to cover up the religious words and phrases on the posters. In Assistant Principal Alligood's presence and in her conference

12

room, Mrs. Walker and Mrs. Gold used the green paper to comply with her instructions to cover the religious words and phrases on the SYATP posters.

In contrast to Mrs. Walker's and Mrs. Gold's affidavits, Assistant Principal Alligood testified that upon inviting Mrs. Walker and Mrs. Gold into her office, she told them that she had a concern about the scripture references on the posters. She denies she told the women that the religious words and phrases on the posters were "inappropriate" under Board policy. She recalls Mrs. Walker and Mrs. Gold told her they thought the SYATP posters should be allowed in the hallways just like other posters. Although Assistant Principal Alligood knew a disclaimer would be attached to each poster, the disclaimer was not discussed at length.

After the three talked about the posters for a few minutes, Assistant Principal Alligood decided to contact Director Davis for advice. She left her own office and went to Principal Moss' office to use the telephone. She first tried to reach Director Davis at his office, but he was not there. She then tried to contact the Board attorney, but he was busy with a client. She then tried Director Davis' cell phone number and he answered. Director Davis was attending a conference in eastern Tennessee.[4]

Assistant Principal Alligood told Director Davis of her concern about the bible verses on the SYATP posters. She does not recall if she told him that the posters also included slogans like "In God We Trust," or "God Bless America," but she recollected he instructed her that the posters could include only the name, date, time and location of the event.

_____

[4]Director Davis testified his cell phone records showed he had a two-minute conversation with Assistant Principal Alligood at 8:25 a.m. on Friday, September 19, 2008. The phone records were not introduced into evidence.

It is perhaps helpful to pause at this point to consider Director Davis' role in these events, as well as his version of the cell phone conversation with Assistant Principal Alligood. Director Davis assumed his new position as Director of Schools for Wilson County on July 1, 2007. He is familiar with Board Policy Number 1.806 (which the Court will quote later in this opinion) and he had applied the policy before September 19, 2008 to screen promotional materials for non-school events in the Wilson County School System. He instructed school principals to contact him if they had any questions about whether certain material complied with the policy and he would make the decision. If he is not sure what decision to make, he contacts the Board attorney for legal advice.

Director Davis explained that Assistant Principal Alligood contacted him on his cell phone about bible verses on SYATP posters brought to Lakeview for display. He could not recall whether she also told him that the posters included phrases like "In God We Trust" and "God Bless America." Those phrases alone, he testified, would not be a reason to disapprove of the posters, nor would the word "pray" be inappropriate. He testified he found nothing inappropriate about such phrases. He explained that twelve of the eighteen schools in the Wilson County School System participate in the SYATP and NDP events, and he has not had any problems with the events at those schools, including the advertisements and promotions of the events. Also, he previously served as superintendent of other school districts in another state and each of them permitted SYATP and NDP events at schools without any difficulties. Director Davis stated he had already approved a flyer for the SYATP event at Lakeview a few days before; however, the flyer did not include bible verses or religious phrases.[5] As Director Davis talked to Assistant Principal Alligood, he had in

_____

[5]The Court observes that the approved SYATP flyer was not limited to the name of the event, date, time and location of the event and other information was included, but none of the other information, previously quoted above, was overtly religious in character. The flyer did describe the

14

mind the approved flyer, the policy, and this Court's Order in <u>Doe</u>. Because he had not had a chance to personally see the SYATP posters in advance and could not properly review them during the phone call, he told Assistant Principal Alligood that he would approve SYATP posters for display as long as they included only the name, date, time and location of the event. He had no discussion with Assistant Principal Alligood about putting paper over the religious phrases on the posters, and he did not direct any school staff member to cover the religious phrases.

After the short conversation with Director Davis, Assistant Principal Alligood returned to her office and relayed to Mrs. Walker and Mrs. Gold that Director Davis stated that the posters should include only the name of the event, date, time and location. She stated that she was following orders.

Mrs. Walker asked what could be done to alleviate the administration's concerns. Assistant Principal Alligood suggested that perhaps the parents could make new posters for the event, and according to her, the parents asked if she had any construction paper, but she could not find any. She did produce some sheets of green 81/2" x 11" typing paper, along with some markers to Mrs. Walker and Mrs. Gold. She testified she thought they planned to make new posters announcing the SYATP event. Mrs. Walker and Mrs. Gold went into an adjoining conference room, and Assistant Principal Alligood left her office to attend to her other duties in the building.

Assistant Principal Alligood further testified that she did not see the altered SYATP posters until they were displayed in the hallways with the religious words and phrases covered by pieces of the green paper she supplied to Mrs. Walker and Mrs. Gold. She said the posters looked like they had been desecrated, and she felt badly about the situation. She saw Mrs. Walker and Mrs. Gold

---

event as involving prayer.

taking photographs of the posters, but because she did not want to pick a fight with them, she did not speak to them.

Most of the posters were displayed at eye level, but at least one was attached to the wall above a trophy case. A disclaimer was attached to each poster. On those posters which originally contained language stating the Praying Parents sponsored the SYATP event, the disclaimer was placed to cover any reference to the Praying Parents. (Def. Exs. 1 & 2.) The disclaimer advising that the Wilson County School System and the administration at Lakeview School does not endorse and sponsor the event was written in small type and was difficult to read even at eye level. (Def. Ex 2.) Assistant Principal Alligood stated the disclaimer on the poster above the trophy case was so high and the type so small that it probably could not be read by elementary students. Assistant Principal Alligood also testified that only fifth grade students might understand the meaning of the word "endorsed."

The Court finds that the essential truth about what actually transpired at the school that morning lies somewhere between these accounts. As the Court views the evidence, when Assistant Principal Alligood first met with Mrs. Walker and Mrs. Gold in her office, she expressed to them her concern about all of the religious language on the SYATP posters, not just the specific scripture verses and citations, but also references to Jesus and requests to come and pray, although she may have emphasized the objectionable bible verses as examples of her concern. The Court further finds that Assistant Principal Alligood did not tell Director Davis during their phone conversation that the SYATP posters included common patriotic slogans like "In God We Trust," and "God Bless America." Rather, she related to Director Davis particular examples of what she thought was impermissible religious speech on the posters that were clearly associated with Christianity, such

16

as the biblical references, because such expressions seemed to her to be the most problematic after this Court's <u>Doe</u> decision.

The Court further finds that Director Davis was placed at a disadvantage in making a decision because he was out of town, he could not see the posters to evaluate them, he was dependent on Assistant Principal Alligood's description of the posters and their content, and he apparently felt that if he had to make an immediate decision without seeing them he would approve only the essential information about the event. He was aware of Policy Number 1.806 and this Court's Order in <u>Doe</u> and only a few days before he had approved an SYATP flyer that included more information than merely the name, date, time and place of the event. In fact, the SYATP flyer approved by Director Davis used the word "pray" to describe the purpose of the same event. Director Davis testified that the word "pray" is not in itself an inappropriate word on a poster for the elementary school hallway, and at other schools he had approved posters with similar words and phrases advertising the same or similar events. The Court finds that Director Davis did not expressly state to Assistant Principal Alligood that any of the religious words, phrases or scripture verses were "inappropriate." Rather, due to the constraints he faced, Director Davis opted for what he thought was a safe policy position which limited the content of the SYATP posters to name of the event, date, time and location.

Assistant Principal Alligood understood at the conclusion of her telephone conversation with Director Davis that she should convey to Mrs. Walker and Mrs. Gold that the content of the SYATP posters was to be limited to name of the event, date, time and location. After hearing Director Davis' testimony, it is not clear whether Assistant Principal Alligood heard or understood the factors that played into his evaluation of the immediate situation or understand that he had already approved

17

the promotional flyer for the event. Director Davis did not characterize the religious words and phrases on the posters as "inappropriate," and Assistant Principal Alligood did not explicitly state that they were, but the message she conveyed to the parents left little doubt that they were. Mrs. Walker and Mrs. Gold reasonably concluded from the total circumstances, including the statements made by the secretary and Assistant Principal Alligood, that the SYATP posters as drawn and presented would not be allowed on display at Lakeview school.

The Court is not required to decide if Assistant Principal Alligood supplied green paper so that the parents could make new posters complying with the restrictions stated by Director Davis or whether she supplied the paper with instructions that they could use the posters already made, but only if they covered the religious speech on the posters. There is no dispute that Mrs. Walker, Mrs. Gold and Mrs. Miller, not the school authorities, used the green paper to cover all of the religious words, phrases, and bible verses on the posters. They did not cover the words voluntarily, but only because they were told by Assistant Principal Alligood the posters could not be displayed unless all of the religious speech was obscured from view and all that remained was the name of the event, and its date, time, and location.

The Plaintiffs believe that the green paper placed on the posters completely changed what they tried to say in a very dramatic way. On one of A.W.'s posters, the "and pray" portion of "come and pray" was covered, leaving just the word, "come." On A.W.'s other poster, as well as two posters made by H.G. and J.G., the phrase, "In God We Trust" was covered by green paper. The Joyce family poster was altered by putting green paper over the phrase "In God We Trust here in America" and the theme bible verse for SYATP, 1 Sam. 3:9. On R.B.'s poster, green paper was used to obscure the SYATP theme bible verse - "'Speak, for your servant is listening' 1 Sam. 3:9."

18

The same bible verse was concealed on the Bounds family poster. Also, green paper was used to cover the phrases "In God We Trust," "Come pray with us," and "God bless the USA" used on posters made by other children. The bible verse, "For where two or three are gathered in my name there I am with thee. Matt. 18:20," was also covered with green paper. (Docket Entry No. 9, Christy Gold Aff. ¶ 27.)

Assistant Principal Alligood testified that she is a Christian and that non-Christians have the same access to the school hallways as Christians do. She related that the issue about the SYATP posters absorbed much of her time on the morning of September 19 as well as some of the afternoon that day because the school staff asked her questions about the displayed posters. Later in the day on September 19, Principal Moss called the school to speak to her again. She told him the parents had used green paper to cover the religious phrases and then displayed the posters in the hallways.

Director Davis testified he is a Christian. He recalled that late on the morning of September 19, he contacted the Board attorney to be sure he had not given Assistant Principal Alligood erroneous advice. He does not recall talking to any of the involved parents on that day. He was not approached at any time by Lakeview students about organizing or promoting the SYATP or NDP events.

James Walker attests that he called Director Davis on Friday, September 19 and asked if the Board was actually requiring phrases like "In God We Trust," "God Bless America," and "Come Pray With Us" to be covered up on SYATP posters. (Docket Entry No. 5, James Walker Aff. ¶ 18.) Mr. Walker tried to explain that he thought the policy ran afoul of this Court's Order and the children's constitutional rights. Although Director Davis testified he does not recall such a

19

conversation, the Court finds the call likely did occur and that Director Davis referred Mr. Walker to the Board attorney.  (Id. ¶ 19.)

Mr. Walker then contacted his attorney, who in turn tried to telephone the Board attorney on September 19.  Unable to reach the Board attorney, the Walkers' counsel e-mailed the Board attorney and asked that the policy be rescinded.  In a reply e-mail, the Board attorney confirmed the policy as conveyed to Mr. Walker by Director Davis.  (Id. ¶ 21, Docket Entry No. 4, Exs. BB & CC.)  Attorneys for the parties exchanged further correspondence regarding the matter on Monday, September 22, 2008, but no resolution was reached.  (Docket Entry No. 4, Exs. DD & EE.)

When Principal Moss returned to the school the next week, he saw the posters with the green paper attached, but he testified he was busy and he did not pay much attention to them and did not remove the green paper to examine the posters to see what had been covered up.  He said he assumed Assistant Principal Alligood had addressed and handled the matter the previous week.

Principal Moss denied that Plaintiff Doug Gold called him on Friday, September 19, but he agreed that Mr. Gold did call him after school on Tuesday, September 23.  It is not material to the Court when this conversation occurred; only that it did occur.  Mr. Gold stated he was concerned about the policy and asked if the green paper could be taken off the SYATP posters.  Principal Moss said he was following policy as instructed by Director Davis.  Mr. Gold asked if Principal Moss had read this Court's entire Order in the Doe case, and Principal Moss admitted he had not done so.  Principal Moss was aware that the parent organizers of the SYATP event removed the posters from Lakeview on Tuesday, September 23, the day before the event.

Principal Moss testified that he is Christian, but he stated that some Lakeview students are not Christian.  He stated in his opinion the issuance of an injunction in this case would infringe on

20

the rights of students who do not wish to participate in advertised religious events. He and Director Davis also stated they are concerned about confusion that may result if they are enjoined from applying Policy Number 1.806 at Lakeview, but not at other schools.

The Plaintiffs state they are outraged that they are unable to express their Christian beliefs in flyers and posters promoting SYATP and NDP events. They find censorship belittling to their faith and they believe the school administration shows hostility to their religion. (See e.g., Docket Entry No. 7, A.W. Aff. ¶¶ 8-14; Docket Entry No. 8, Doug Gold Aff. ¶¶ 19-21; Docket Entry No. 10, H.G. Aff. ¶¶ 8-17; Docket Entry No. 11, Jana Miller Aff. ¶¶ 9-10, 15-17; Christy Gold Aff. ¶ 28-30.) The Plaintiffs want to make posters for future NDP and SYATP events, but if they cannot use words like "God" and "prayer," they do not see the point of making posters because they cannot accurately describe the events. The Plaintiff children also do not wish to get in trouble at school. (See e.g., Docket Entry No. 12, L.M. Aff. ¶¶ 7-10; Docket Entry No. 13, Stacey Joyce Aff. ¶¶ 14-17; Docket Entry No. 14, Melynda Bounds Aff. ¶¶ 6-12.)

The NDP event is coming up on the first Thursday in May. Mrs. Gold and Mrs. Walker plan to help organize the event again this year to coordinate with similar events held across the nation. Mrs. Walker thinks it is imperative that notices and posters be used to promote the event, but she and the other Plaintiffs are deterred from doing so because school officials told them that religious words and phrases may not be used. Mrs. Walker cannot use the official printed notices usually supplied by the national NDP organization because the notices will mention God and prayer. Mrs. Walker believes that any poster that omits God and prayer fails to describe the event adequately. At this point, she does not know how those interested can get the word out about the NDP event. (Docket Entry No. 6, Jennifer Walker Aff. ¶ 38.)

21

# II. ANALYSIS

"A preliminary injunction is an extraordinary remedy designed to preserve the relative positions of the parties until a trial on the merits can be held." Tennessee Scrap Recyclers Ass'n v. Bredesen, 556 F.3d 442, 447 (6th Cir. 2009). Whether to grant a preliminary injunction is left to the discretion of the Court. Id. The Court must assess four factors to determine if a preliminary injunction is warranted: (1) the Plaintiffs' likelihood of success on the merits; (2) whether the Plaintiffs may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction on the public interest. Id. Whether the Plaintiffs are likely to succeed on the merits is a determination of law. Id. The Court will address each of these factors.

## A. Plaintiffs' likelihood of success on the merits

At this juncture, the Court is not deciding the merits of Plaintiffs' case against the Defendants, but the Court is called upon to determine whether Plaintiffs have shown a likelihood that they will succeed on the merits when the case is ultimately tried on a complete record.

### 1. Regulation of religious speech depends on the type of forum

Supreme Court "precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression." Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760 (1995) (citing, among other cases, Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384 (1993) and Board of Educ. of Westside Community Schools (Dist. 66) v. Mergens, 496 U.S. 226 (1990)). Constitutionally protected religious speech, however, is not "accorded a guaranteed forum on all property owned by the State." Id. at 761. The right to use government property for private

22

speech depends upon "whether the property has by law or tradition been given the status of a public forum, or rather has been reserved for specific official uses." Id.

If government property is a public forum by law or tradition, then the State's right to limit private speech is "sharply circumscribed." Id.; Perry Educ. Ass'n v. Perry Local Educ. Ass'n, 460 U.S. 37, 45 (1983). "The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place." Perry Educ. Ass'n, 460 U.S. at 45 (holding school's internal mail system is not a traditional public forum because granting selective access to outside organizations like YMCA, Cub Scouts, and other civic and church organizations to use the facilities does not transform government property into a public forum). Where a public forum is at issue, the state may impose reasonable, content-neutral, time, place and manner restrictions, but it may regulate expressive content only if the restriction is necessary and narrowly drawn to serve a compelling state interest. Capitol Square Review, 515 U.S. at 760.

A second type of forum is the nonpublic forum, which consists of public property which is not by tradition or designation a forum for public communication. Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Schools, 457 F.3d 376, 381 (4th Cir. 2006). To maintain a nonpublic forum, the government must employ "selective access" policies whereby forum participation is governed by individual, non-ministerial judgments. Id. The government is allowed to be more restrictive in its regulation of speech in a nonpublic forum than in a traditional public one. Id. In addition to content-neutral, time, place, and manner restrictions, the government may also "'reserve the [nonpublic] forum for its intended purposes, communicative or otherwise,

23

as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'" <u>Id.</u> (quoting <u>Perry</u>, 460 U.S. at 46).

A third category lies in between and is a hybrid of the first two. This type of forum is created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, and for the discussion of certain subjects. <u>Id.</u> at 382. The forum may be limited or unlimited in character, but the government cannot create such a forum through inaction or by permitting limited discourse. <u>Id.</u> Such a forum can be created only by intentionally opening a nontraditional forum for public discourse. <u>Id.</u> The Supreme Court has referred to such an intermediate forum as a "designated public forum" or a "limited public forum." <u>Id.</u> There is a difference between the two names.

In a "limited public forum," the government "creates a channel for a specific or limited type of expression where one did not previously exist. In such a forum, 'the State may be justified in reserving [its forum] for certain groups or for the discussion of certain topics,' subject only to the limitation that its actions must be viewpoint neutral and reasonable." <u>Id.</u> (quoting <u>Good News Club v. Milford Central School</u>, 533 U.S. 98, 106-107 (2001)). In a "designated public forum," the government "makes public property (that would not otherwise qualify as a traditional public forum) generally accessible to all speakers. In such a forum, regulations on speech are 'subject to the same limitations as that governing a traditional public forum' – namely, strict scrutiny." <u>Id.</u> (quoting <u>International Soc'y for Krishna Consciousness, Inc. v. Lee</u>, 505 U.S. 672, 678-679 (1992)).

A school district, like a private owner of property, may legally preserve the property under its control for the use to which it is dedicated. <u>Rosenberger v. Rector and Visitors Of The University</u>

of Virginia, 515 U.S. 819, 829 (1995) (citing Lamb's Chapel, 508 U.S. at 390). The Supreme Court has said:

> Once [the State] has opened a limited forum . . . the State must respect the lawful boundaries it has itself set. The State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum,' . . . nor may it discriminate against speech on the basis of its viewpoint. . . . Thus, in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

Id. at 829-830 (observing "the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints.")

There is no evidence before the Court at this time from which the Court can conclude that the Lakeview main lobby and the hallway leading to the cafeteria constitute a public forum open by law or tradition to indiscriminate public use for communicative purposes, such that any school regulation of expressive content must be necessarily and narrowly drawn to serve a compelling state interest. The elementary school lobby and hallway cannot be compared to a public sidewalk or a public park, both of which are recognized as public forums traditionally open to all manner of speech. Pleasant Grove City, Utah v. Summum, — U.S. —, 129 S.Ct. 1125, 1132 (2009).

Rather, the evidence shows that the Board has intentionally opened a limited public forum at the schools in the Wilson County School System, creating selective access to the school audience by certain speakers on certain topics. Wilson County Board of Education Policy Number 1.806 provides in pertinent part:

25

No part of the school system, including the facilities, the name, the staff, and the students, shall be used for advertising or promoting the interests of any commercial, political, or other non-school agency or organization except that:

* * *

3.    Community, educational, charitable, recreational, and other similar civic groups may advertise events pertinent to students' interests or involvement. Such advertisement, including the distribution of materials, shall be subject to any procedures related to time, place, and manner established by the principal;

4.    The principal shall screen all materials prior to distribution to ensure their appropriateness. The principal may prohibit materials that:

- Would be likely to cause substantial disruption of the operation of school;
- Violate the rights of others;
- Are obscene, lewd, or sexually explicit; or
- Would reasonably cause students to believe they are sponsored or endorsed by the school.

(Def. Ex. 4.) Thus, relating this policy specifically to Lakeview, the Board has opened a limited public forum that is reserved to speakers for community, educational, charitable, recreational, and other similar groups who wish to advertise events pertinent to students' interests. Those wishing to advertise or promote commercial or political interests or some other non-school agency or organization are precluded from using the forum. The subject matter restrictions imposed in the first part of the policy appear to be reasonable in light of the purpose served by the forum in an elementary school setting.

Plaintiffs have shown that the Praying Parents group at Lakeview, among other things, organizes and advertises prayer events like SYATP and NDP that are of interest to some students and their parents. Although the policy does not expressly mention access to the forum by religious groups, the Praying Parents group falls within the category of "other similar groups who wish to

26

advertise events pertinent to students' interests or involvement."  Defendants do not contend that

the Praying Parents group should be totally excluded from advertising their events at Lakeview.

Having opened a limited public forum and drawn distinctions as to the kinds of subject matter that

may be addressed in light of the forum's purpose, the school administration must maintain viewpoint

neutrality when imposing further reasonable regulations.  See Lamb's Chapel, 508 U.S. at 392-393

(holding school district violated Free Speech Clause when it excluded a private group from

presenting films at the school based solely on the films' discussions of family values from a

religious perspective); Good News Club, 533 U.S. at 107 (holding school exclusion of Good News

Club based on its religious nature constitutes viewpoint discrimination).

### 2. *Free speech and viewpoint discrimination*

"Students in the public schools do not 'shed their constitutional rights to freedom of speech

or expression at the schoolhouse gate."  Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266

(1988) (holding that educators do not offend the First Amendment by exercising editorial control

over the style and content of student speech in school-sponsored expressive activities so long as their

actions are reasonably related to legitimate pedagogical concerns).  Nonetheless, the First

Amendment rights of students in the public schools are not automatically co-extensive with the

rights of adults in other settings and student rights must be viewed in light of the special

circumstances of the school environment.  Id.; Morse v. Frederick, — U.S. —, 168 L.Ed.2d 290

(2007) (holding no student free speech violation occurred where government interest in stopping

student drug abuse allowed school to restrict student expression that was reasonably regarded as

promoting drug abuse); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986) (holding high

school student's free speech rights were not violated where school officials suspended him for making sexually suggestive speech at school assembly).

Student speech expressing personal views cannot be restricted on the school premises unless school authorities have reason to believe that such expression will substantially interfere with the work of the school or impinge on the rights of other students. Hazelwood Sch. Dist., 484 U.S. at 266. Government regulation may not favor one speaker over another, and "[d]iscrimination against speech because of its message is presumed to be unconstitutional." Rosenberger, 515 U.S. at 828. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." Id. at 829. "Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Id. "These principles provide the framework forbidding the State to exercise viewpoint discrimination, even when the limited public forum is one of its own creation." Id.

Plaintiffs contend that Policy Number 1.806 as written is too vague and too broad to prevent viewpoint discrimination. The policy provides that the school principal "shall screen all materials prior to distribution to ensure their appropriateness." In the Doe case, the Court mentioned Policy Number 1.806 in a footnote and observed that the "policy does not make clear what is meant by ensuring the 'appropriateness' of particular materials[,]" citing Child Evangelism Fellowship, 457 F.3d at 388 ("*nothing* in the policy prohibits viewpoint discrimination, requires viewpoint neutrality, or prevents exclusion of flyers based on [the school's] assessment of the viewpoint expressed in a flyer"). (Doe, No. 3:06-0924, Docket Entry No. 133, Memorandum at 46 & n.10.) The policy does

28

state that the principal may prohibit materials that (1) would be likely to cause substantial disruption in the operation of the school; (2) violate the rights of others; (3) are obscene, lewd, or sexually explicit; or (4) would reasonably cause students to believe the activities are sponsored or endorsed by the school. The third clause clearly has no relevance to this case. The Court will consider whether (1), (2) or (4) could provide a basis for restriction or exclusion of the religious speech at issue.

The Court does not understand Defendants to contend that the SYATP posters would likely cause substantial disruption of the operation of the school. At any rate, the Court finds that the proof does not support such a contention. Director Davis testified he had supervised many schools where SYATP and NDP events were held, including twelve of the eighteen schools in the Wilson County school system, and he had never had any problems. During his short conversation with Assistant Principal Alligood on September 19, he restricted the content of SYATP posters to name of event, date, time, and location because he had not had any opportunity to review the posters, but he clearly agreed the word "pray" and patriotic slogans such as "In God We Trust," "God Bless America," and similar phrases using the word "God" were not inappropriate. Further, the individual Defendants did not testify that words like "God" and "Jesus" or bible verses that were specifically tied to the description of the upcoming event would materially and substantially disrupt the work and discipline of the school. See Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 508, 513 (1969)(observing in case where students wore black arm bands to protest Vietnam War that student speech may not be suppressed unless school officials reasonably conclude the expressive activity will materially and substantially disrupt the work and discipline of the school or collide with the

rights of others and there was no evidence of such). Therefore, the Court concludes that substantial disruption was not a proper or sufficient ground for barring Plaintiffs' posters as they were written.

The next grounds for prohibiting advertising materials for events under Policy Number 1.806 are the second clause, "whether the posters violated the rights of others," and the fourth clause, "whether the posters' content would reasonably cause students to believe the activities were sponsored or endorsed by the school." These two potential bases for restriction or exclusion of content are closely related and will be discussed together.

The Sixth Circuit has said that a school cannot refuse to distribute or display material advertising a program with underlying religious content if it also distributes or displays material for secular activities; however, the school may refuse to distribute or display material that contains proselytizing religious speech. See Curry v. Hensiner, 513 F.3d 570, 579 (6th Cir. 2008) (citing Hills v. Scottsdale Unified Sch. Dist., 329 F.3d 1044, 1053 (9th Cir. 2003)). The elementary school principal in Curry refused to allow a student, during a curricular event, to distribute candy canes with a proselytizing Christian message attached because the distribution could offend other students and their parents, and the evidence showed in fact that one student who saw the candy cane with the message attached was offended.[6] Id. The "school's desire to avoid having its curricular event

---

[6]The Christian message attached to the candy cane stated:

The Meaning of the Candy Cane
Hard candy: Reminds us that Jesus is like a "rock," strong and dependable.
The color Red: Is for God's love that sent Jesus to give his life for us on the cross.
The Stripes: Remind us of Jesus' suffering–his crown of thorns, the wounds in his hands and feet; and the cross on which he died.
Peppermint Flavor: Is like the gift of spices from the wise men.
White candy: Stands for Jesus as the holy, sinless Son of God.
Cane: Is like a staff used by shepherds in caring for sheep. Jesus leads us and
(continued...)

30

offend other children or their parents, and to avoid subjecting young children to an unsolicited religious promotional message that might conflict with what they are taught at home qualifies as a valid educational purpose." Id. The court held that "the principal's determination that the religious card should not be permitted was the product of her reasonable evaluation of legitimate pedagogical concerns, and fell within her discretion as a school administrator, and therefore did not violate any right [the student] enjoyed under the First Amendment." Id. at 579-580. See also Tinker, 393 U.S. at 509 (in order for school officials "to justify prohibition of a particular expression of opinion, [they] must be able to show that [their] action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.").

Here, by contrast, the SYATP and NDP events are non-curricular activities held before school hours and the posters created by students and their parents to announce and describe the events fall within the subject matter permitted in the limited public forum opened by Policy Number 1.806. It appears from the evidence the school administrators were primarily concerned about bible verses referenced or quoted on some of the posters. Principal Moss pointed out that some Lakeview students are not Christians, implying that the SYATP posters would violate the rights of non-Christian students. Moreover, because the posters would be displayed in the school lobby and hallway during school and non-school hours, the Court can reasonably draw from the testimony that the administrators were concerned other students and parents might interpret the posters as Christian proselytization that was endorsed by the school. Director Davis, Principal Moss and Assistant

---

[6](...continued)
watches over us when we Trust him.

Curry, 513 F.3d at 574-575.

31

Principal Alligood–all new to Lakeview or the school system in 2007 or 2008–were aware of the prior Doe lawsuit, but they may not have been familiar with all its findings and conclusions. However, the Court finds that they were desirous of making decisions regarding the posters which were in compliance with school policy, the Court's Order in Doe, and the Establishment Clause of the Constitution.

Other than Principal Moss's limited reference to non-Christian students, however, no evidence was presented to show that the posters did or could have violated the rights of others. And other than Assistant Principal Alligood's testimony that she thought the disclaimer was too small to read or that only older students might understand the word "endorsed," there is no further showing that other Lakeview students and parents might reasonably have believed the SYATP activity was sponsored or endorsed by the school. See Good News Club, 533 U.S. at 113-114. Simply issuing or permitting a communication involving a religious organization during school hours "does not render the communication state speech, nor does it invariably create a perception of endorsement or coercion by government officials[,]" see Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Pub. Sch., 373 F.3d 589, 596 (4th Cir. 2004), and the risk of school endorsement here was ameliorated by the presence of the disclaimer, albeit in small type font, attached to each poster.

The Court is of the opinion that school administrators are trying to walk a fine constitutional line between Establishment Clause concerns, Free Speech rights of Lakeview students and parents, and the rights of other students and parents in light of the previous lawsuit. Where the Does sued the school system specifically alleging that SYATP and NDP posters contained proselytizing Christian messages that should be banned from the school, it is understandable that the individual

32

Defendants are trying to avoid future conflict. Possibly in an effort to alleviate such conflict, Defendants restricted the content of SYATP posters to the name of the event, date, time and place.

The Court concludes that in doing so the Defendants missed a critical legal distinction. Having provided a limited public forum, the school administration may impose reasonable content-neutral time, place and manner restrictions *on access to the forum*. In other words, the school may determine the time, place and manner for permitted speakers to use the forum, so long as such time, place and manner regulations treat all content neutrally. Thus, the school can determine when, were, and how posters may be displayed inside the school, as well as the number of posters allowed to be displayed for a given event, so long as groups and speakers given access to the forum are treated the same. The school may regulate the *specific content of the posters* only if the regulation of the speech is reasonable to preserve the purpose for which the forum was opened and the regulation is viewpoint neutral, i.e., it does not suppress expression merely because the school officials oppose the speaker's point of view, see Child Evangelism Fellowship of Maryland, Inc., 457 F.3d at 381, or believe it to be controversial.

Defendants essentially conceded that they objected to the content of Plaintiffs' posters precisely because of the Christian viewpoint expressed in them, most obviously through references to bible verses. Requiring the Plaintiffs to cover all religious speech on the posters under the guise of a reasonable time, place and manner restriction reflects a misunderstanding of law, with the result that the Defendants stifled religious speech, while the restrictions imposed to stifle the speech were neither reasonable nor viewpoint neutral.

There still remains the question of whether any of Plaintiffs' religious speech constituted proselytization that could be banned under Curry. The record includes photographs of nine different

33

SYATP posters that were admitted into evidence at the hearing.[7] (Def. Exs. 1, 6, 7.) Seven of the posters (Def. Ex. 1) were presented to the school by Mrs. Walker. Three of the seven posters included the event theme scripture verse Mrs. Walker obtained from the national SYATP Internet website: "Speak, for your servant is listening." 1 Samuel 3:9." All of the posters, including those with the theme scripture verse, can be fairly described as written invitations: they identify and describe the event and invite others to attend and participate.

In the Court's view, the posters do not contain any language even remotely like that labeled as proselytizing in <u>Curry</u>. The short bible verse expressing the national theme for the event is not unlike similar national themes adopted for events sponsored by the Boy Scouts, Girl Scouts, Boys and Girls Club, YMCA, and other civic groups. Mrs. Gold's affidavit reveals that one other poster (which apparently was not photographed and submitted into evidence) included a different bible verse that was covered by green paper: "For where two or three are gathered in my name there I am with thee. Matt. 18:20." (Docket Entry No. 9, Christy Gold Aff. ¶ 27.) While this particular scripture moves closer to proselytization, the Court concludes that, in the overall context of the poster, the scripture verse was used to describe the prayer event.

As to whether other Lakeview students would feel coercive pressure to attend and participate in the SYATP and NDP prayer events, the relevant community to be considered for legal purposes would be the parents, not the elementary school children. Parents choose whether their young children will attend the SYATP and NDP events, and if so, they must get them up early and take

_____

[7]Two of them were the posters presented by Mrs. Elkins for approval to Principal Moss. (Defs. Ex. 6 & 7.) Since Mrs. Elkins is not a named plaintiff in the case and the posters are not linked to any named student plaintiff in this case, the Court will not focus on those two posters at this time.

them to the event before school starts. Because the children cannot attend without their parents' permission, the children cannot be coerced into engaging in religious activities. See Good News Club, 533 U.S. at 115. The posters invite students and parents to attend the event advertised. By its name, it has a religious connotation, but no one is forced to attend or to engage in a religious exercise; no one is made to read the Bible or pray, and no one is bound to sit in attendance while other students or parents pray. No one is required to accept a religious tract or flyer advertising a religious event, pay attention to a poster, or listen to a religious message. See Child Evangelism Fellowship of Maryland, Inc., 373 F.3d at 599.

Mere receipt of an invitation to a religious activity does not rise to the level of support for, or participation in, religion or its exercise to create an Establishment Clause problem. Id. at 600; Mergens, 496 U.S. at 247 (holding no Establishment Clause violation where school authorities required students to listen to public address announcement inviting them to an after-school religious club); Brown v. Gilmore, 258 F.3d 265, 278 (4th Cir. 2001) (rejecting Establishment Clause challenge where teachers required students to remain in classroom while learning of invitation to use a minute of silence to pray). "[E]ven if we were to inquire into the minds of schoolchildren in this case, we cannot say the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility toward the religious viewpoint if the [Good News] Club were excluded from the public forum." Good News Club, 533 U.S. at 118.

Policy Number 1.806 as written vests broad discretion in school administrators to screen materials prior to distribution to ensure they are "appropriate," but what is meant by this term is only generally addressed in the policy. The Court understands that policies must be written to apply to a variety of circumstances, but here it seems that the decision to approve or disapprove of speech,

35

particularly religious speech, is left to the sole judgment and discretion of a school principal, and in most cases, Director Davis, without sufficient guidance as to how that judgment and discretion should be exercised. See Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757 (1988) (observing a statute or regulation placing unbridled discretion in hands of government official or agency constitutes a prior restraint and may result in censorship). It leaves the door of invidious discrimination wide open.

Where the policy fails to provide protection against potential discriminatory exercise of school authorities' discretion, the policy creates too great a risk of viewpoint discrimination and likely cannot survive constitutional scrutiny. Child Evangelism Fellowship, 457 F.3d at 387-389. The policy is also problematic as applied. As illustrated by the facts of this case, the policy can easily be used to suppress protected religious speech without sufficient safeguards to assure reasonableness and viewpoint neutrality. Whether the Court will ultimately hold the policy unconstitutional on its face or as applied is a question that remains open until the time of trial when the Court can made its decision on a full evidentiary record.

In summary, Plaintiffs have shown a likelihood of success on the merits of their claim that the policy as written grants the school administration unbridled discretion to infringe speech based on its viewpoint and that the policy as applied to the SYATP posters at issue, and as potentially applied to similar NDP posters in the future, unconstitutionally restricts religious speech in violation of the First Amendment. Plaintiffs have also shown a likelihood of success on the merits of their Fourteenth Amendment due process and equal protection claims because the policy as written likely does not give adequate notice of what is meant by the term "appropriate," and constitutionally protected religious speech may be precluded while similar secular speech is not.

36

**B. Irreparable harm to Plaintiffs absent the injunction**

Plaintiffs have shown through their affidavits that they will suffer irreparable harm absent a preliminary injunction. They desire to make posters to announce and describe the upcoming NDP event, but the circumstances surrounding the SYATP event have placed a chill on the Plaintiffs' exercise of their free speech rights. Both the students and parents are hesitant to create posters in the future for fear the school administration will again deem certain religious words and phrases "inappropriate." This factor weighs in favor of granting a preliminary injunction.

**C. Substantial harm to others**

There is no persuasive evidence before the Court that granting injunctive relief will result in substantial harm to others. The individual Defendants generally testified that enjoining the policy and/or its application would likely cause confusion and disruption in school administration, and that their actions were taken in good faith to avoid Establishment Clause concerns. Because the preliminary injunction will be limited to Lakeview School, the Court does not believe that the injunction will cause undue confusion or disruption for school administrators. "There is no doubt that compliance with the Establishment Clause is a state interest sufficiently compelling to justify content-based restrictions on speech[,]" Capitol Square Review, 515 U.S. at 761-762, but "it is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination." Good News Club, 533 U.S. at 113. Based upon the evidentiary record, the harm to Plaintiffs' First Amendment free speech rights outweighs any other evidence of substantial harm to others. This factor, too, weighs in favor of granting a preliminary injunction.

**D. Impact of the injunction on the public interest**

Finally, the public certainly has an interest in allowing the Board and school administrators to direct their attention and energy primarily to the effective and efficient administration of Lakeview's learning environment for hundreds of elementary students without the interruption of legal proceedings and constraints on executive decision-making that may be imposed by a preliminary injunction. However, fundamental free speech rights of students and parents are also at stake, and the public has an interest in those individual rights as protected by the First Amendment to the Constitution. Schools must be administered within the bounds of law. The Court concludes that this factor weighs more favorably toward granting a preliminary injunction to protect individual constitutional rights.

## III. <u>CONCLUSION</u>

For all of the reasons stated, Plaintiffs' Motion for Preliminary Injunction (Docket Entry No. 4), will be granted. Pursuant to Federal Rule of Civil Procedure 65, Defendants Wilson County School Board of Education, Director of Schools James M. Davis, Lakeview School Principal Stan Moss, and Assistant Lakeview School Principal Bertie Alligood will be preliminarily enjoined and restrained from enforcing Policy Number 1.806 at Lakeview Elementary School to suppress religious speech on posters that are created by students and parents to announce and describe See You At The Pole™ and National Day of Prayer events, and which are submitted for display in the Lakeview School main lobby and hallway leading to the cafeteria, unless any school regulation restricting religious speech on posters is reasonable, viewpoint-neutral, and in accordance with federal law. Further, Plaintiffs must abide by any reasonable and content-neutral, time, place and manner restrictions on use of the forum.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE